## 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

### JOHN JOHNSON V. COMMONWEALTH.

January 18, 1923.

HOMICIDE—*Self-Defense—Evidence Held Insufficient to Support Verdict of Guilty—Case at Bar.*—In the instant case, a prosecution for homicide, accused claimed and his claim was supported by the evidence for the defense that the shooting was in self-defense after deceased had cut at him with a knife, cutting his coat but missing his person, and when the deceased was again advancing upon accused and about to cut him with the knife. The policeman who came upon the scene of the shooting soon after it occurred found a knife in the hand of the dead man, and the chief of police testified that he noticed that the coat of accused was cut. None of the Commonwealth's witnesses saw the shooting, but testified as to hearing a quarrel at the place of the shooting about liquor. But the evidence for the Commonwealth did not establish that the quarrel about liquor and that immediately preceding the homicide were the same. Two witnesses for the Commonwealth testified that when the body was first found deceased had no knife in his hand, but this testimony was discredited as the physical facts demonstrated that the knife was in the hand of the deceased when he was shot and fell.

> *Held:* That the evidence was insufficient to support a conviction of murder in the second degree.

Error to a judgment of the Corporation Court of the city of Newport News.

*Reversed and remanded.*

By the verdict and judgment under review the accused, John Johnson, was convicted of murder in the second degree and sentenced to twelve years confinement in the penitentiary.

The homicide occurred about ten o'clock on a very dark night on the porch of the residence of the accused in a portion of the city of Newport News inhabited en-

tirely by negroes.   Both the accused and the deceased were negroes.   The deceased was shot throught the heart and instantly killed by a single shot from a pistol in the hands of the accused.   The accused claims that the shooting was in self-defense after the deceased had cut at him with a knife, cutting his coat, but missing his person, and the deceased was again advancing upon the accused and about to cut him with the knife.   The testimony of and for the accused (consisting of three witnesses besides the accused, being eye-witnesses of the shooting, his wife, his daughter and an apparently disinterested witness named Thomas, all negroes), establishes these facts, unless this testimony would have to be disregarded as in conflict with the testimony for the Commonwealth.   The following physical facts are also in accord with those just mentioned, namely, the policeman, a witness for the Commonwealth, who came to the scene of the shooting soon after it occurred and examined the dead body of the deceased, found that a knife was in a hand of the dead man as he lay on his side. Further, the chief of police, to whom the accused went and voluntarily surrendered himself on the same night of the homicide, testified that he noticed at the time that the coat of the deceased was cut; and the coat exhibited before the jury on the trial showed that it had been cut with a knife.

None of the Commonwealth's witnesses saw the shooting.

The house in which the accused lived is a two-story house, divided into four separate flats, of three rooms each, two flats on the first floor and two on the second floor, the latter reached by separate stairway entrances going up from the front porch.   The two flats on the first floor were also entered from the front porch; making four entrances into the building from the front

porch. The accused, with his wife and daughter, lived in one of the first floor flats. Other tenants lived in the other flat on the first floor and in the rooms in the two flats on the second floor.

One of the witnesses for the Commonwealth, who lived in the flat on the first floor adjacent to that occupied by the accused, testified that while in her room inside the house, she heard the shot fired which killed the deceased, and that immediately before the shot she heard a woman's voice out on the porch say, "I would not do that," or "Don't do that;" and that a short time before that she heard two men on the front porch quarreling, but she could not hear what they said, except that she heard one of them say, "See here, see here."

The only evidence for the Commonwealth which it can rely upon to support the verdict is the testimony of three witnesses (Phillip Carter, George Askew and Fannie Smart), all negroes, none of whom saw the shooting, but who testified to the following circumstances:

Carter testified that he lived in the third house from that occupied by the accused on the same street. That as he was going home on the night of the homicide—not fixing the time of night except saying that "it was pretty late"—and passed by the house in which the accused lived, he saw some men on the front porch of that house, near the upstairs door, four or five in number, standing and talking and "fussing;" that he did not see the deceased or the accused among them, but heard the voice of the accused talking, and heard him say: "I will kill any damn man about my liquor;" that witness didn't hear any more; that he was positive that no woman was there—"nothing but men;" and that "after" witness got in his own house—"as soon as" witness got in his own house, "the gun went off." That witness went immediately to where the deceased was lying and struck matches to see who it was and saw that it was George

Miller, who lived in the same house with witness.    That
he had not then heard anything about the deceased hav-
ing a knife and was not examining the body to see if the
deceased had any weapon, but observed that the body
lay on its side and, "He had both hands shut up," and—
"it was no knife or nothing there;" and witness re-
peated several times the statement that "I saw he
didn't have nothing—didn't have any knife," or words
to that effect.    That he told the people who "came to
the door" that "it was George who lived upstairs with
us" and they told him "not to put a hand on him."
That nobody went to the body but the witness.    That
witness stayed there but a short time and then went up
the street and told the policeman "about it."

George Askew testified that he lived in the same
house with the deceased, across the hall from him.    That
he was asleep at the time of the shot which killed the de-
ceased, but was waked and told that somebody was
shot.    That he put on his shoes and ran out and saw
Phil. Carter as he was going up the street to tell the po-
liceman of the homicide.    That witness then went to
the body and some one said it was George Miller.    That
witness struck a match and "held it to his face," and
saw that it was George Miller, "and then went back and
was standing on (witness') porch and two men come
*    *    and they pushed him (the body) over."    That
"when the crowd came there," witness "went back
again" and when he looked "there it was a knife lying
about this far from his hand (indicating)."    That when
he "looked before" witness "didn't see any knife at all
there."

Fannie Smart testified that she lived in the house
next door to that in which the accused lived; that on the
night of the shooting of the deceased she was out on her
front porch and saw two men come up on the front

porch of the house in which the accused lived, and they were standing there when a third man came up on the porch, and this man said: "Look here, boys, where's my liquor?" and one of them, witness did not know any of them, said: "Well now I will tell you for a friend, I don't know nothing about it, but they divided it up between the boys and give one of the niggers ten dollars." That thereupon, witness "went back in the house and shut the door, and says, "there is going to be a scrap or killing one because these men is messing with liquor." That witness "went back in the house and when (she) came back (she) heard the gun fire and (she) opened the door   *   *."

*J. T. Newsome, W. R. Walker,* and *R. H. Pree,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

There is but one assignment of error which raises the following question:

1. Was there sufficient evidence to support the verdict of the jury in its finding, in effect, that the fatal shot fired by the accused was not in self-defense?

The question must be answered in the negative.

The testimony of Carter and Askew, to the effect that when the body was first found the deceased had no knife in his hand and that the knife found in the hand of the deceased by the policeman when he came was placed there by one of the two unknown men said to

have been seen by Askew to have come and pushed the body over and run away some time after the shooting and after Carter had seen the body and gone to inform a policeman of the homicide, is absolutely discredited by the physical facts that the policeman found the knife in the hand of the dead body; that the shot passed through the heart, which meant instant death; that the dead hand could not have picked up the knife, which lay some distance from it immediately following the coming and going of the two unknown men, according to the testimony of Askew. The physical facts demonstrate that the knife was in the hand of the deceased when he was shot and fell.

Moreover, the testimony for the Commonwealth, when all of it is regarded as true, does not show that the quarrel on the porch about liquor immediately preceded the shooting, as must have been the fact to sustain the theory of the Commonwealth and the verdict of the jury. According to the testimony for the Commonwealth that quarrel may have been between different persons from the accused and the deceased, and may have preceded the quarrel between them which brought on the assault upon the accused on the part of the deceased and the consequent shooting of the latter by the accused. Certainly there was an interval between the quarrel about liquor and the shooting, according to the two witnesses for the Commonwealth who testified about such quarrel. The witness, Carter, said that, after hearing that quarrel going on, he went from the house of the accused to witness' house, the third house away, on the same street, and went into his house before he heard the fatal shot. He does not say how long a time it took him to do this. He does not even state that he went directly home or that he did not stop on the way. The witness, Fannie Smart, said that, after

hearing the quarrel about liquor, she "went back in the house and when (she) came back (she) heard the gun fire and (she) opened the door." This language is ambiguous. The witness does not explain in her other testimony what she meant by this language—whether she meant that she went back in the house and afterwards came back to the door when she heard the shot; or that when she went back in the house she heard the shot. When we remember that the accused is entitled to every reasonable doubt on the subject of every link in the chain of the evidence against him, we must construe this language as saying that she went back into the house and afterwards came back to the door, and that it was then that she heard the shot. And she does not say how long she was back in the house before she came back to the door and heard the shot. Moreover, the testimony for the Commonwealth and for the accused concurred in tending to show that there was no woman present at the quarrel about liquor; and that there was a woman present at the quarrel immediately preceding the shooting.

Further: In a locality such as that in which the homicide occurred, as shown by the record, doubtless many quarrels occur in the night time. We do not think that the evidence for the Commonwealth, giving it its full value, establishes that the quarrel about liquor and that immediately preceding the homicide were the same.

On the whole we feel constrained to reverse the case and award the accused a new trial.

*Reversed and remanded.*